SAMUEL M. FELTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4783. Promulgated June 18, 1945.

*Fred L. Rosenbloom, Esq.,* for the petitioner.
*Karl W. Windhorst, Esq.,* for the respondent.

### OPINION.

Harron, *Judge*: Petitioner has suffered a loss under the written contract he made with Boltz in 1938. He deducted the claimed loss in his return for 1940 as a bad debt. When the return was audited, respondent determined that the loss was "a loss due to embezzlement," and it was disallowed, no explanation being given. Upon brief,. both parties devote their respective arguments to the proposition that the loss was one due to embezzlement, petitioner contending that the facts do not show that the embezzlement occurred prior to 1940, and respondent contending that the embezzlement occurred in 1938, the year when petitioner deposited $20,000 with Boltz. Whether or not the loss should be treated as a loss from embezzlement depends upon the facts, which are unusual.

The question is primarily a fact question. Most of the facts have been stipulated and there is no real dispute about the facts. The problem is one of interpreting the facts. A fair and reasonable interpretation of the facts is as follows:

In 1938 petitioner deposited $20,000 with Boltz for investment and reinvestment, under a written agreement. Boltz was dishonest, but that was not known. Many people had made and were making similar contracts and deposits with him. He simulated compliance with his obligations to his clients by making reports to them, including petitioner, in which he stated that he had made for their accounts purchases and sales and had received dividends and profits. In fact he did not. He also simulated good faith by complying with one provision in his contracts, namely, that a principal could withdraw all or part of his fund, plus the increment, on ten days' notice. In 1940, until he disappeared, Boltz paid cash to clients totaling $192,627.41. Later, upon investigation, it was found that Boltz had been insolvent at all times since July 1, 1933. The parties have stipulated that as a fact, but it is understood to mean that after that date the liabilities of Boltz exceeded his assets. However, the fact did not prevent the repayment of very substantial sums to clients, as set forth above, as long as all his creditors and principals did not make their demands simultaneously, and they did not. Boltz was exceedingly clever in manipulating his scheme so that he had on hand very large sums of cash after July 1, 1933, up until the time when he disappeared in October 1940. Therefore, the fact that he was insolvent over a long period is not a determinative fact. He intermingled all his receipts and deposits from clients. The contracts permitted him to intermingle the funds of one client with those of another client in an attorney bank account.

Without doubt, Boltz kept his dishonest scheme going through this commingling of funds. Since he did not keep the funds of any client separate from the funds of others, it is impossible to find as a fact that petitioner's deposit in the general fund vanished at any particular time before October of 1940.

Boltz was like a juggler throwing many balls in the air. When he ceased throwing the balls out, the aerial pattern fell to earth. As long as he kept funds circulating back to his clients, he succeeded in getting money advanced to him, and, also, petitioner's chance of getting his money back was as good as that of any of the clients who actually were repaid. Petitioner's chance of getting his money back lasted up to and during 1940. Under these facts, the identifiable event which determined petitioner's loss was the disappearance of Boltz in 1940. The juggler stepped back into the wings of the stage and the curtain went down. The act was an illusion; the finis was real.

The facts in this proceeding differ from the facts in the usual situation of embezzlement. In many instances of embezzlement, it is the money of one person which is taken from time to time under cover. There is no problem relating to the identity of the ownership of the funds. Such is not the case here. Boltz, in one sense, offered to the public a plan resembling that of an investment trust, even though he did not issue trust certificates. Petitioner entered into the plan for profit. For example, the agreement with Boltz provided that Boltz could take delivery of one certificate or bond representing the aggregate of purchases made for several accounts under identical contracts without the delivery to the investor of separate certificates or bonds. The parts of each purchase so made for several clients were to be allocated on Boltz' books to the accounts of the respective clients. Petitioner, until October 25, 1940, believed he had a good contract and that his money was invested or held for investment under that contract. If petitioner had withdrawn his money from Boltz' plan during the period it was in operation, petitioner would not have known that the plan and the operation thereof were a sham. We think much weight should be given in this case to the fact that petitioner advanced his money under a contract which permitted commingling of funds, and that during 1940 the contract was still in effect as part of a network of similar contracts.

Under the unusual facts, petitioner should not be compelled to make such strict proof as respondent insists upon the matter of establishing the exact year in which his own advance of money to Boltz was lost. Such proof is impossible. It can not be found definitely that petitioner's money was embezzled, stolen, or lost prior to October 1940. Until sometime in October 1940 the contract with Boltz was in effect,

and the entire venture was in operation. During 1940 Boltz had a large amount of cash. Clients deposited with Boltz during 1940 cash and securities totaling $199,609.73. We think it would be an unreasonable conclusion to say that petitioner could not have received from Boltz the full amount of his $20,000 deposit out of the above fund during 1940, just as many other clients received back their deposits. As has been pointed out above, it was the *abandonment of the manipulations* by Boltz in 1940 which determined, conclusively, that petitioner sustained a loss. Under such view petitioner's claim is sustained. It has been found as a fact that the loss was sustained in 1940.

In so holding, we reject the view, upon which respondent's argument rests, that the loss was sustained prior to 1940 because of the general insolvency of Boltz.

Respondent points out that petitioner recovered $595.72 from the receiver in 1942 and 1943, and contends that petitioner is entitled to deduct only the net amount of his loss in 1940, if he is entitled to a deduction in that year. This contention is sustained. See *Schwabacher Hardware Co.*, 45 B. T. A. 699. The deduction allowable is $18,989.75.

*Decision will be entered under Rule 50.*